**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 18-cv-2362-WJM-STV

TROUBLESHOOTER NETWORK, INC., and
THOMAS G. MARTINO,

      Plaintiffs,

v.

HOMEADVISOR, INC., and
ANGI HOMESERVICES, INC.,

      Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
PURSUANT TO  FED. R. CIV. P. 56 AND MEMORANDUM IN SUPPORT, DENYING
PLAINTIFFS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT, AND
GRANTING DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF
PLAINTIFFS' DAMAGES EXPERT, PETER J. SCHAFFER**

---

This matter is before the Court on:

1.    Defendants HomeAdvisor, Inc. and ANGI Homeservices, Inc.'s (jointly, "Defendants") Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 and Memorandum In Support ("Defendants' Motion for Summary Judgment") (ECF No. 104);

2.    Plaintiffs Troubleshooter Network, Inc. and Thomas G. Martino's (jointly, "Plaintiffs") Joint Motion for Partial Summary Judgment ("Plaintiffs' Motion for Summary Judgment") (ECF No. 105); and

3.    Defendants' Motion to Exclude the Testimony of Plaintiffs' Damages Expert, Peter J. Schaffer ("Rule 702 Motion") (ECF No. 139).

For the reasons explained below, Defendants' Rule 702 Motion and Motion for

Summary Judgment are granted, and Plaintiffs' Motion for Summary Judgment is denied.

## I. BACKGROUND[1]

### A.   Thomas Martino and The Troubleshooter Show

Thomas Martino is a Colorado talk radio host and online consumer advocate who is known as "The Troubleshooter."  (ECF No. 104 at 2 ¶ 1; ECF No. 105 at 3 ¶ 1.) Martino's radio show, "The Troubleshooter Show," operates live five days a week from radio station KHOW in Denver; it is syndicated on KRDO radio in Colorado Springs and can be heard nationally on iHeart Radio, YouTube, and Facebook via podcast.  (ECF No. 105 at 3 ¶ 2.)

Troubleshooter Network ("Troubleshooter") is a Colorado corporation that runs a referral list website, www.referrallist.com, which offers referral services for various business and also promotes Martino.  (ECF No. 104 at 2 ¶ 2.)  Businesses pay membership fees to be reviewed or endorsed by Martino and to be placed on Tom Martino's Referral List.  (ECF No. 105 at 4 ¶¶ 8–9.)  Homeowners can search the Tom Martino Referral List for service providers at no charge.  (*Id.* ¶ 10.)

Plaintiffs have used the TOM MARTINO mark since 1981 for a variety of services related to consumer advocacy, referral list services, and hosting Martino's radio show. (*Id.* at 3 ¶ 6.)  Plaintiffs assert that they have spent over $100,000 in advertising to promote Tom Martino's Referral List.  (*Id.* ¶ 7.)  Businesses who wish to use the Tom

---

[1] The following factual summary is based on the parties' briefs on the motions for summary judgment and documents submitted in support thereof.  These facts are undisputed unless attributed to a party or source.  All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

Martino name or the Tom Martino's Referral List mark in their advertising must pay a fee and be vetted and authorized by Plaintiffs.  (*Id.* at 4 ¶ 11.)

## B.    HomeAdvisor

HomeAdvisor, Inc. ("HomeAdvisor") operates a business that matches consumers' home improvement service requests to service professionals who are members of HomeAdvisor's national network.  (ECF No. 104 at 2 ¶¶ 3–4, 6; ECF No. 105 at 4 ¶ 12.)  Consumers may submit service requests by providing information about their project to HomeAdvisor through its website, www.homeadvisor.com, or through a consumer service representative by telephone; HomeAdvisor then uses that information to match the request to local service professionals. (ECF No. 104 at 2 ¶ 5.) HomeAdvisor's services are free to consumers; however, professionals within HomeAdvisor's network must pay for a membership subscription and pay "lead fees" when they receive customer contact information relating to a service request.  (*Id.* ¶ 6; ECF No. 105 at 4 ¶¶ 13–14.)

ANGI is a holding company that owns HomeAdvisor.[2]  (ECF No. 104 at 3 ¶ 7.)

## C.    HomeAdvisor's Ads

Defendants did not receive permission from Plaintiffs to use the Tom Martino name for any purpose, including advertising.  (ECF No. 105 at 5 ¶ 20.)

Nonetheless, between at least June 29, 2018 and September 17, 2018, HomeAdvisor bid on the keyword "tom martino referral list" through its Bing Ads account.  (ECF No. 104 at 2 ¶¶ 8–9.)  Home Advisor ran some search engine

---

[2] The parties dispute whether ANGI is a separate business entity.  (*See* ECF No. 104 at 3; ECF No. 114 at 2–3.)  The Court need not resolve this factual dispute to resolve the motions for summary judgment and Rule 702 motion.

advertising which displayed "tom martino referral list."  (ECF No. 105 at 4–5 ¶ 15.)

As a result, on at least 1,524 occasions, individuals searching for Tom Martino or his Referral List were presented with ads that linked to HomeAdvisor's website.  (ECF No. 105 at 5 ¶ 17; ECF No. 104 at 3 ¶¶ 10–13.)  Individuals clicked on the ads and were routed to HomeAdvisor's website at least 663 times.  (ECF No. 105 at 5 ¶ 18.)  Over 60 individuals who clicked on HomeAdvisor's ad containing Martino's name completed service requests with HomeAdvisor and HomeAdvisor generated a "net result" (after refunds) of $2,946.52 from selling other service requests as leads to service providers.  (ECF No. 105 at 8 ¶ 28; ECF No. 113 at 6 ¶¶ 18–19 & 11 ¶ 28.)

Brenda Mager, an executive producer at Troubleshooter, provided a declaration in which she asserts that between July 8, 2018 and August 10, 2018, she received "numerous calls inquiring about certain about certain members of ReferralList.com that they heard advertising during the radio show"; however, "when they searched for the Referral List and Tom Martino, they were directed to a website with a search box on the front page," and they could not find the business they had just heard  advertised.  (ECF No. 106-13 ¶ 4.)  Ms. Mager further states that on one occasion, she received a call from an elderly gentleman who believed he had received a roofer referral from ReferralList.com, but had actually received a referral from HomeAdvisor.com.  (*Id.* ¶ 5.)

Marc Mager, Vice President of Troubleshooter, also provided a declaration in which he states that he received more than a dozen calls complaining that merchants, contractors, or service professional were not listed on ReferralList.com, as advertised. (ECF No. 106-11 ¶ 3.)

## B.   Procedural History

Plaintiffs initiated this action on September 14, 2018 (ECF No. 1) and filed their

Second Amended Complaint ("SAC") on May 27, 2020 (ECF No. 88).  In the SAC,

Plaintiffs assert claims for: (1) invasion of privacy by appropriation and violation of the

right of publicity for Tom Martino (ECF 88 at 11–13); (2) false endorsement under

Section 43 of the Lanham Act, 15 U.S.C. § 1125(a) (*see id.* at 13–14); (3) federal unfair

competition and false advertising under Section 43 of the Lanham Act (*see id.* at 14–

17); (4) federal trademark infringement (*see id.* at 17–18); (5) common law trademark

infringement and unfair competition (*see id.* at 18–19); (6) deceptive trade practices

under the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-105 (*see id.* at 19–

20); (7) unjust enrichment (*see id.* at 20–21); and (8) negligence (*see id.* at 21–23).

The parties filed their respective motions for summary judgment on September

25, 2020 (ECF Nos. 107, 108.)  Thereafter, Defendants filed the Rule 702 Motion on

August 6, 2021.  (ECF No. 139.)

## II. RULE 702 MOTION

## A.   Legal Standard

A district court must act as a "gatekeeper" in admitting or excluding expert

testimony.  *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2005).

Expert opinion testimony is admissible if it is relevant and reliable.  *See Daubert v.*

*Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 594–95 (1993). The opinions are relevant

if they would "assist the trier of fact to understand the evidence or to determine a fact in

issue."  Fed. R. Evid. 702.  They are reliable if (1) the expert is qualified "by knowledge,

skill, experience, training, or education," (2) his opinions are "based upon sufficient facts

or data," and (3) they are "the product of reliable principles and methods."  *Id.*  "In reviewing whether an expert's testimony is reliable, the trial court must assess the reasoning and methodology underlying the expert's opinion."  *United States v. Rodriguez–Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006) (citations and quotations omitted).  The proponent of expert testimony has the burden to show that the testimony is admissible.  *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

**B.    Analysis**

Plaintiffs' expert, Peter Schaffer, opined on the "fair market value for the use of the name of Mr. Thomas Martino in the electronic search engine advertising of a direct competitor, HomeAdvisor, in 2018 (the "Period"), as well as the outcome of a hypothetical endorsement negotiation between Mr. Martino and HomeAdvisor in the Period."  (ECF No. 139-1 at 2.)  He determined:

> Because HomeAdvisor is a direct competitor in the same field as Mr. Martino, his endorsement of HomeAdvisor would carry great weight and value.  It would be akin to Ferrari endorsing Ford.
>
> . . .
>
> The fair market value of Mr. Martino's name to such a direct competitor would be significantly higher than it would be to the business that Mr. Martino typically endorses.
>
> In addition, it is Mr. Martino's practice to charge larger entities more for his endorsement.  I have reviewed Mr. Martino's other personal endorsement contracts, which are annual contracts that range from between $500 and $20,000 per month.  My understanding is that none of these business operate a competing digital marketplace.  Additionally, all of the endorsements were geographically limited to the Denver or Colorado market.
>
> . . .

> In my opinion, the outcome of a hypothetical negotiation between Mr. Martino and HomeAdvisor, for the use of the "Tom Martino" name in HomeAdvisor's electronic search engine advertising would have been a guaranteed 3-year contract at $60,000 per month, which would have resulted in a guaranteed minimum of $2.16 million.  Again, because of Mr. Martino's concerns about endorsing HomeAdvisor as a direct competitor and how such an endorsement would affect the future value of his endorsement contracts with others, he would have insisted on such a guaranteed payment.

(*Id.* at 8–11.)

Defendants seek to exclude Schaffer's expert testimony because his opinions and methodology are unreliable.  (ECF No. 139 at 4–10.)  They argue that Shaffer's opinions are not "based on sufficient facts or data" and are not the "product of reliable principles and methods" because, *inter alia*, they are not susceptible to testing, are not subject to peer review, and are not based on apples-to-apples comparisons.  (*Id.* at 6–7.)

In response, Plaintiffs contend that "Defendants' arguments that Mr. Schaffer's methodology is unreliable go to weight, not admissibility," and are merely a "veiled attempt to preclude Plaintiffs from presenting a legal theory of damages . . . ."  (ECF No. 144 at 5.)  They argue that using existing endorsement contracts as benchmarks in a hypothetical negotiation is a "well-accepted methodology for assessing damages."  (*Id.* at 7.)

After carefully reviewing Schaffer's opinion, the Court concludes that his methodology is unreliable.[3]  Among other things, the terms of the hypothetical HomeAdvisor contract is based on Martino's subjective assertion about what he would

---

[3] For purposes of this Order, the Court assumes that use of a hypothetical negotiation may be constitute a proper methodology for assessing damages.

have demanded in a contract between the parties.  (*See, e.g.*, ECF No. 139-1 at 8 (noting that "Martino is not a fan of HomeAdvisor's business practices" and "would likely have insisted on a significant premium for any endorsement of HomeAdvisor"); *see id.* at 10 (opining that Martino "would have insisted on a contract with guaranteed payment over time"); *see also* ECF No. 144 at 8 ("Schaffer understood that an endorsement of a direct competitor would have harmed Mr. Martino's reputation . . . so a fixed term of three years would have been a necessary part of the hypothetical negotiations . . . .").)

But without evidence demonstrating that Martino's subjective expectations are based on prevailing industry standards or are otherwise grounded in reality, Schaffer's opinions are impermissibly speculative and unreliable.  *See D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, 2020 WL 60351, at *5 (D.N.H. Jan. 6, 2020) (recognizing that "fair market value" is defined as the "reasonable license fee on which a willing buyer and a willing seller would have agreed for the use taken by the infringer" and that there must be "objective evidence supporting the fair market value of a hypothetical license fee," rather than evidence showing merely the subjective valuations of the parties); *M2 Software, Inc. v. Madacy Entm't*, 2003 WL 25667610, at *1 (C.D. Cal. Jan. 23, 2003) (precluding evidence of royalty theory of damages where "there is no evidence that any licensing negotiations occurred between the parties . . . and there is no evidence that [plaintiff] was ever willing to license its mark to anyone").

For example, Schaffer concludes that the hypothetical negotiation would have resulted in "a guaranteed 3-year contract at $60,000 per month."  (ECF No. 139-1 at 11.)  This hypothetical deal is *three times* as expensive and extends *three times* longer

than Martino's largest endorsement contract.[4]  (*See id.* (recognizing that Martino's other personal endorsement contracts "are annual contracts that range from between $500 and $20,000 per month").)  Even if the Court were to accept Schaffer's opinion that the hypothetical HomeAdvisor contract would result in a higher monthly fee based on HomeAdvisor's status as a "direct competitor," he offers no justification grounded in reality as to why the rate would be *three times* as high as Martino's largest endorsement contract.  Likewise, Schaffer's assertion that the hypothetical HomeAdvisor contract would have resulted in a guaranteed contract is belied by the fact that Plaintiffs' other contracts included an option to cancel the contract within 30–60 days.  (ECF No. 139 at 9.)

At bottom, because the terms of the hypothetical HomeAdvisor negotiation rest on little more than Schaffer's say so, the Court concludes that there is "simply too great an analytical gap between the data and the opinion proffered" to justify the admission of Schaffer's opinions under Rule 702.[5]  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (recognizing that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence based on only the *ipse dixit* of the expert"); *Goebel v. Denver and Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000) ("[i]t is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate").

The Court therefore grants the Rule 702 Motion and excludes the expert

---

[4] Schaffer's conclusion that the contract would have extended 3 years is particularly questionable because the ads at issue in this lawsuit ran from only June to September 2018. (ECF No. 88 at 21 ¶ 75.)

[5] Because the Court excludes Schaffer's opinions as unreliable, the Court need not reach Defendants' arguments regarding Schaffer's qualifications.  (*See* ECF No. 139 at 3–4.)

testimony of Peter Schaffer.

## III. MOTIONS FOR SUMMARY JUDGMENT

A.      **Standard of Review**

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

B.      **Claim One: Invasion of Privacy by Appropriation and Violation of Martino's Right to Privacy**

Plaintiffs assert that Defendants misrepresented Martino's "famous name without license or permission from" Martino, which has invaded Martino's privacy and infringed on his right of publicity and damaged his goodwill.  (ECF No. 88 at 11–13.)  Both sides have moved for summary judgment with respect to this claim.  (ECF No. 104 at 11–13; ECF No. 105 at 9–14.)

"Some courts . . . have recognized a 'right of publicity' which permits plaintiffs to recover for injury to the commercial value of their identities." *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1220 (10th Cir. 2004) (quoting *Joe Dickerson & Assoc., LLC v. Dittmar*, 34 P.3d 995, 999 (Colo. 2001) (en banc)).  This right is "designed to reserve to a celebrity the personal right to exploit the commercial value of his own identity." *Id.* (quoting *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 624 (6th Cir. 2000)). However, as noted in *Donchez*, the "Colorado Supreme Court does not appear to have expressly recognized this tort." *Id.*  Nonetheless, the parties seem to agree that Colorado recognizes a tort for "right of publicity" and that the elements set forth in *Joe Dickerson & Associates*, 34 P.3d at 1002, for the tort of invasion of privacy by appropriation of another's name or likeliness apply to the instant case.  (*See* ECF No. 104 at 11; ECF No. 105 at 10.)

To prove an invasion of privacy claim under Colorado law, a plaintiff must show: (1) the defendant used the plaintiff's name or likeness; (2) the use of the plaintiff's name or likeness was for the defendant's own purposes or benefit, commercially or otherwise; (3) the plaintiff suffered damages; and (4) the defendant caused the damages incurred. *King v. PA Consulting Grp., Inc.*, 485 F.3d 577, 592 (10th Cir. 2007) (quoting *Joe Dickerson & Assoc.*, 34 P.3d at 1002).  A plaintiff claiming commercial damages must further establish the commercial value of his name.  *Id.* (citing *Donchez*, 392 F.3d at 1220–21).

Plaintiffs assert that they have been injured by Defendants in three ways: (1) Plaintiffs were harmed because Defendants diverted consumers and revenue away from the Plaintiffs; (2) Plaintiffs were harmed by the negative publicity generated when

consumers falsely associated the services of HomeAdvisor with Plaintiffs' business; and (3) Plaintiffs were harmed because HomeAdvisor used Martino's name without paying for the endorsement value that was due to Plaintiffs.  (ECF No. 105 at 13–14; ECF No. 114 at 18–21.)

Defendants respond that "the evidence in this case does not support Plaintiffs' damage allegations or a causal link between the ads at issue in this case and any injury to Plaintiffs."  (ECF No. 113 at 13; *see also* ECF No. 104 at 11–13.)

The Court considers each theory of damages below.

1.  <u>Diverted Consumers and Revenue</u>

Plaintiffs argue that "Defendants misled consumers that were searching for Tom Martino to HomeAdvisor's website and offered, and in some cases provided, services to those consumers" and therefore harmed Plaintiffs by "divert[ing] consumers and revenue away from the Plaintiffs."  (ECF No. 105 at 13.)

In response, Defendants argue that "Plaintiffs do not cite to any evidence of any consumers, customers (service providers), or revenue that was diverted by any of the HomeAdvisor ads at issue in this case, and Plaintiffs have not produced any evidence of such diversion."  (ECF No. 113 at 14.)  For support, Defendants point to Martino's deposition testimony:

> Q: Are you aware of any business that you or Troubleshooter Network lost as a result of any consumer confusion?
>
> A: No, I'm not aware of any business I lost, but I can't say.  I can't say how much more business I would have gotten.  We were advertising heavily during that time.

(ECF No. 106-19 at 159.)

Defendants further argue that because neither Plaintiffs nor Defendants charge customers to use their services and because consumers can use both parties' services, "the fact that some search users clicked on the ads at issue or made a free service request on HomeAdvisor's website does not establish, *ipso facto*, that revenue was diverted from Plaintiffs' business."  (ECF No. 113 at 14.)  The Court agrees.

It is undisputed that the parties generate revenue in different ways.  While Plaintiffs earn revenue through monthly membership fees paid by businesses who want to be vetted and/or endorsed by Martino (ECF No. 105 at 4 ¶¶ 8–9), Defendants earn revenue through membership subscriptions and receive "lead fees" from service providers when they share customer contact information relating to a service request with those service providers (ECF No. 104 at 2 ¶ 6).

To be sure, Plaintiffs have presented evidence that over 60 individuals who clicked on HomeAdvisor's ad containing Martino's name completed service requests with HomeAdvisor and that HomeAdvisor generated a "net result" (after refunds) of $2,946.52 from selling other service requests as leads to service providers.  (ECF No. 105 at 8 ¶ 28; ECF No. 113 at 6 ¶¶ 18–19 & 11 ¶ 28.)  However, because Plaintiffs do not earn revenue from consumers who utilize services from a Martino-endorsed company, the fact that HomeAdvisor earned revenue from its ads does not demonstrate that Defendants' advertisements caused any revenue to be diverted away from Plaintiffs.[6]  Critically, both Plaintiffs' and Defendants' services are free to consumers

---

[6] Because Plaintiffs and Defendants have different revenue models, the Court is likewise unpersuaded by Plaintiffs' arguments that Defendants' profits should be considered as a proxy for Plaintiffs' damages.  (ECF No. 114 at 19.)  As stated above, the Referral List does *not* generate revenue from service providers in exchange for individual service leads.

(ECF No. 105 at 4 ¶ 10; ECF No. 104 at 2 ¶ 6), and Plaintiffs have not provided any evidence that Plaintiffs have lost revenue by virtue of Defendants' advertisements.  For example, Plaintiffs have not demonstrated that: (1) HomeAdvisor's advertisements caused a Referral List member to terminate their agreement with Plaintiffs; or (2) a service provider would have entered into a Referral List agreement with Plaintiffs but chose not to do so because of HomeAdvisor's ads.

Plaintiffs further argue that a "loss of opportunity associated with the diversion of customers is recognized as a harm without the need to identify a particular pecuniary loss."  (ECF No. 123 at 5.)  For support, Plaintiffs cite *King* for the proposition that loss of online consumer traffic and a loss of business marketing opportunities themselves have value.  (*See id.* (citing *King*, 485 F.3d at 592).)

In *King*, the plaintiff had testified that the defendant's misuse of his name prevented him from receiving invitations to several industry conferences, which he testified were "one of the primary ways that [he] market[ed] [his] services."  485 F.3d at 592.  The Tenth Circuit concluded that "a reasonable jury could have concluded that, but for [defendant's] continued use of [plaintiff's] name, those conference invitations would have reached [the plaintiff]" and that "the marketing opportunities have value in and of themselves, value that [the plaintiff] could have captured but for [defendant's] wrongful conduct."  *Id.*

Here, unlike in *King*, the fact that consumers might have clicked on HomeAdvisor's advertisements does not mean that they did not also click on real ReferralList.com advertisements.  *Cf. Network Automation*, *Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1152 (9th Cir. 2011) ("[R]easonable, prudent and

experienced internet consumers are accustomed to . . . exploration by trial and error. They skip from site to site, ready to hit the back button whenever they're not satisfied with a site's contents.").  As such, the Court has not been provided with any evidence that Plaintiffs were deprived of any marketing opportunities, or that these marketing opportunities generate any revenue for Plaintiffs.

Accordingly, the Court finds that Plaintiffs have not established evidence that Defendants harmed them by diverting consumers and revenue away from Plaintiffs.

2. Negative Publicity With the False Association of HomeAdvisor's Services with Plaintiffs' Business

Plaintiffs argue that they were harmed by the "negative publicity generated when consumers falsely associated the services of HomeAdvisor—which were un-vetted by Plaintiffs—with Plaintiffs' business."  (ECF No. 105 at 13.)  For support, Plaintiffs rely on affidavits signed by Brenda Mager and Marc Mager.  (*Id.* at 7–8; ECF No. 106-11; ECF No. 106-13; ECF No. 114 at 13–14.)  Defendants argue that these affidavits constitute inadmissible hearsay prohibited by Federal Rule of Evidence 802 and therefore cannot be presented in a form that would be admissible in evidence at trial.  (ECF No. 113 at 9–11, 16; ECF No. 129 at 12.)

At the summary judgment stage, evidence need not be submitted "in a form that would be admissible at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Parties may, for example, submit affidavits in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form.  *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005).  Nonetheless, "the content or substance of the evidence must be admissible."  *Thomas v. Int'l Bus. Machs.*, 48 F.3d

478, 485 (10th Cir. 1995).  Thus, for example, at summary judgment a court should disregard inadmissible hearsay statements contained in affidavits, as those statements could not be presented at trial in any form.  *See Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1082 n.5 (10th Cir. 1999).

The requirement that the substance of the evidence must be admissible is not only explicit in Rule 56, which provides that "[s]upporting and opposing affidavits shall . . . set forth such facts as would be admissible in evidence," Fed. R. Civ. P. 56(e), but also implicit in a court's role at the summary judgment stage.  To determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury.  *See Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1216 (10th Cir. 2004) (affirming summary judgment, in light of the available evidence, because "[j]ury verdicts may not be based on speculation or inadmissible evidence or be contrary to uncontested admissible evidence").

Plaintiffs respond that the Magers' affidavits are "not hearsay" and instead constitute "lay opinion testimony that is rationally based on the Magers' experience and perceptions and are not based on scientific, technical, or other specialized knowledge." (ECF No. 123 at 13–14.)  However, the distinction about whether the Magers' statements constitute lay opinion testimony (in contrast, apparently, to expert testimony) has no bearing on whether their statements regarding customer complaints are hearsay—*i.e.*, out-of-court statements offered for the truth of the matter asserted.  Fed. R. Evid. 801(c).  Because Plaintiffs seek to use the statements as evidence that consumers were confused by HomeAdvisor's advertisements or had a negative experience with HomeAdvisor, the Court concludes that the Magers' reports of

16

customer calls are hearsay and continues to analyze whether the statements may

nonetheless be presented in an admissible form at trial.[7]

In her declaration, Ms. Mager states, *inter alia*:

> During the period, approximately between July 8, 2018 and
> August 10, 2018, I received numerous calls inquiring about
> certain members of ReferralList.com that they heard
> advertising during the radio show.  They said when they
> searched for the Referral List and Tom Martino, they were
> directed to a website with a search box on the front page.
> They said when they entered the member's name they just
> heard advertised, they could not find the business.

> On one occasion, we got a call from an elderly gentleman,
> who claimed the roofer he paid did not show up to do his
> roof.  He was under the impression that he found the roofer
> on ReferralList.com.  Upon further investigation, we
> discovered he had actually gone to HomeAdvisor.com.

(ECF No. 106-13.)

Of course, if Plaintiffs knew the identity of the callers, they could subpoena the

callers to testify regarding their complaints and their purported confusion regarding

HomeAdvisor's advertisements.  However, it is uncontroverted that Ms. Mager does not

know the identity of the callers, and Plaintiffs do not represent that they can or will have

any of these consumers testify as part of their case at trial.  Ms. Mager stated as much

in her deposition:

> Q: Did you take any notes from this call from this elderly
> gentleman about the roofer?

> A: No.

> Q: Do you remember the roofer's name that he claimed to
> have paid, who didn't show up, and that you were able, then
> to do your investigation about?

---

[7] Notably, Plaintiffs have not demonstrated that the statements are being introduced for
a legitimate non-hearsay purpose.

A: No.

. . .

Q: So as you sit here today, or when you did this declaration, oh, not quite a year ago, do you have the names of any of those 15 to 20 callers?

A: No.

Q: Is there any way you can think of that you can go back and recreate the information, so you could find out who they were?

A: No.

(ECF No. 113-4 at 3–4.)

Similarly, in his declaration, Mr. Mager states,

Shortly after the [advertising campaign] started, I received numerous calls into hour [*sic*] Consumer HelpCenter, (303.M-A-R-T-I-N-O) and emails to live@troubleshooter.com (advertised daily on our radio show), regarding ReferralList.com.  The calls had a common theme, expressing concern and confusion that certain merchants, contractors or service professionals were not listed on ReferralList.com as advertised.  I assumed people were not typing in our URL correctly and would instruct them on the correct website address.

After more than a dozen calls and even more emails, I got one particular call that caused me to do a detailed investigation.  That particular call was from a member of ReferralList.com, Michael Ross (aka, the Carpet Doctor).  He complained that his membership on ReferralList.com is being diminished by deceptive advertising and he wanted us to do something about it or he would have no choice but to stop advertising with us.

(ECF No. 106-11 ¶¶ 3–4.)  Like Ms. Mager, Mr. Mager testified that he does not have the names of any of the callers.  (ECF No. 106-1 at 119 (Q: Have you saved or are you aware of the names of any of those callers? A: No . . .").)  Moreover, Mr. Mager testified

that he no longer has any of the e-mails that he referenced in his declaration.  (*See id.* at 120–21 (Q: Do you have any of those emails saved? A: No. We wouldn't have those. Our emails after – they're deleted or gone I think in 30, 60, 90 days, whatever Google does. . . .").)

Accordingly, because the Plaintiffs have not demonstrated that they will be able to present admissible evidence regarding the calls or e-mails that the Magers received, the Court will not consider whether the calls or e-mails described in the declarations constitute evidence that HomeAdvisor's advertisements generated negative publicity for Plaintiffs.

Moreover, Mr. Ross's purported statement to Mr. Mager does not demonstrate that Plaintiffs have been damaged by Defendants' advertisements.  As an initial matter, Mr. Mager testified during his deposition that he did not recall Mr. Ross's exact statement.[8]  (*See id.* at 122.)  However, because Mr. Mager testified that he believed that Mr. Ross continued to advertise with Plaintiffs (*id.* at 122–23), this purported call does not constitute evidence that Defendants suffered any harm from companies who pay Martino to endorse their businesses.

Indeed, even Martino admitted during his deposition that he was not aware of any customers who thought less of him as a result of HomeAdvisor's advertisements:

> Q: Do you or anybody at Troubleshooter Network have the names of any consumers who were led to believe that you endorsed HomeAdvisor as a result of search engine advertisements?

---

[8] The Court notes that Mr. Ross's text message to Mr. Mager does not contain any threats that Mr. Ross would stop advertising with Plaintiffs if Plaintiffs did not act in response to Defendants' advertisements.  (ECF No. 113-6 at 2.)

A: Do I have the names of them, no.

Q: All right. Has anyone ever told you that they think less of you or the Troubleshooter Network due to the HomeAdvisor advertisements?

A: No.

. . .

Q: . . . Have you put any dollar figure or determined any dollar figure with regard to diminishment of value of the Troubleshooter Marks?

A: No.

Q: With regard to diminishment of value -- diminishing of value of Tom Martino's name, have you put any monetary value on that?

A: No.

. . .

Q: Okay. Can you point me to any facts that you're aware of that the use of your name by HomeAdvisor -- by HomeAdvisor has diminished the goodwill of your name or Troubleshooter's name?

A: No. I can only speculate right now because of the people that called and probably other people that have used clients, thinking they were on my Referral List.

Q: I'm not asking you to speculate, sir.

A: Okay. So I don't have any hard figures right here and now.

Q: Okay. Have you seen any, even though they may not be in front of you now?

A: I told you we're right now researching, as I said earlier, additional damages.

(ECF No. 106-19 at 158–59, 173, 176.)

Accordingly, the Court finds that Plaintiffs have failed to provide admissible evidence regarding Plaintiffs' purported damages from the negative publicity generated by Defendants' advertisements.

### 3. Use of Martino's Name Without Payment

Plaintiffs' final theory of damages is that "Plaintiffs were harmed because HomeAdvisor used Tom Martino's name without paying for the endorsement value that was due to the Plaintiffs." (ECF No. 105 at 13.) They point out that Martino charges for endorsements and that "Defendants failed to contract or pay for the months of national, endorsements from" Martino. (ECF No. 114 at 20.)

However, as explained in Part II, Schaffer's expert testimony is unreliable and therefore is inadmissible at trial. Without this testimony, Plaintiffs are without *evidence* regarding the value of Martino's name in the context of search engine advertising and a hypothetical agreement between HomeAdvisor and Troubleshooter.[9] Attorney argument regarding the appropriate measure of damages, as opposed to providing evidence of such harm, is insufficient to survive summary judgment. *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1135 (10th Cir. 2003) ("Conclusory allegations that are

---

[9] In their response to Defendants' Motion for Summary Judgment, Plaintiffs contend that "[s]uch national[ ] endorsements, were they agreed to, would have cost at least $10,000 per month per state, for a total of $1.5 million, just for the three month period in which they were used before Defendants were sued." (ECF No. 114 at 20.) As an initial matter, the Court notes that the estimated endorsement fee cited by Plaintiffs—$500,000 per month for all 50 states—is over eight times higher than the estimated endorsement fee cited by Plaintiffs' own expert witness. (*Compare* ECF No. 114 at 20 *with* ECF No. 139-1 at 8–11.) Moreover, Plaintiffs cite no evidence supporting their estimate that a national endorsement would cost $10,000 per month per state. The Court cannot, and will not, rely on attorney argument alone regarding losses because "the argument of counsel is not evidence, and cannot provide a proper basis to deny summary judgment." *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1061 (10th Cir. 2009) (citing *Hinds v. Sprint/United Mgmt. Co.,* 523 F.3d 1187, 1198 n. 6 (10th Cir. 2008) (stating that, "[t]o avoid summary judgment, a party must produce specific facts showing that there remains a genuine issue for trial" and that "mere conjecture" is insufficient)).

unsubstantiated do not create an issue of fact and are insufficient to oppose summary judgment."); *RV Horizons, Inc. v. Smith*, 2020 WL 6701119, at *21 (D. Colo. Nov. 13, 2020) (same).

Accordingly, the Court finds that Plaintiffs have failed to provide admissible evidence for Plaintiffs' injury or damages based on Defendants' use of Martino's name without paying him the endorsement value of his name.

* * * *

For the reasons set forth above, the Court concludes that Plaintiffs have failed to establish admissible evidence demonstrating that they have been injured and/or damaged by Defendants' actions in this case. *See RV Horizons, Inc.*, 2020 WL 6701119, at *21 (recognizing that making an argument regarding the appropriate measure of damages, as opposed to providing evidence of such harm, is insufficient to survive summary judgment). As such, Defendants are entitled to summary judgment on Plaintiffs' invasion of privacy claim.

**C.     Claims Two, Three, Four, and Five: Lanham Act Claims & Common Law Trademark Infringement & Unfair Competition Claim**

Plaintiffs assert three claims under Section 43 of the Lanham Act, 15 U.S.C. § 1125: (1) a false endorsement claim, (2) a federal unfair competition and false advertising claim, and (3) federal trademark infringement claim. (ECF No. 88 at 13–18.) Plaintiffs also assert a claim for common law trademark infringement and unfair competition, alleging that Defendants' actions "are likely to cause significant confusion with Plaintiff [Troubleshooter Network's] established and superior trademark rights," that "the consuming public is likely to be deceived by Defendants' use of the [ ] marks" and "have caused damage and irreparable harm to Plaintiffs and to the value and goodwill

symbolized and associated with its [ ] marks."  (*Id.* at 18–19.)

As relevant here, Section 43 of the Lanham Act states:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

The parties agree that to succeed on the false endorsement and trademark infringement claim under Section 43 of the Lanham Act, Plaintiffs must establish: (1) that Defendants made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another; or (b) the characteristics of the goods or services; and (4) injury to the plaintiff.  *Quinton Holdings LLC v. AXYS Golf LLC*, 2020 WL 3971644, at *3 (D. Colo. July 14, 2020) (citing *Cottrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1252 (10th Cir. 1999)); *Donchez*, 392 F.3d at 1219 (recognizing that the

elements of common law trademark or service mark infringement are similar to those required to prove unfair competition under § 43(a) of the Lanham Act).  (ECF No. 104 at 14–15; ECF No. 114 at 21, 31.)

The parties likewise agree that to sustain their false advertising claim under the Lanham Act, a plaintiff must establish that: (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about their services; (2) the misrepresentation is material, in that it is likely to influence a consumer's purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured because of defendant's misrepresentation.  *Berken v. Jude*, 2013 WL 6152347, at *2 (D. Colo. Nov. 22, 2013).  (ECF No. 104 at 15; ECF No. 114 at 29.)

Defendants move for summary judgment on these claims, arguing that "Plaintiffs have no evidence of any actual consumer confusion or the 'irreparable harm' described in Plaintiffs' Complaint" and "no competent evidence to support an inference that the public is or was likely to be deceived or misled."  (ECF No. 104 at 20–22.)  Defendants further contend that "Plaintiffs have not shown any injury traceable from Defendants to either Mr. Martino or [Troubleshooter Network]."  (*Id.*)  In response, Plaintiffs argue that Defendants profited directly from their deceptive use of Tom Martino and Referral List in their ads and that "Plaintiffs suffered damages in the form of lost sales."  (ECF No. 114 at 30–32.)  Plaintiffs do not respond with any argument specific to their common law trademark infringement and unfair competition claim and instead incorporate their

analysis for their federal trademark infringement claim.[10]  (*See id.* at 31–32.)  Plaintiffs

also seek summary judgment on these claims.  (ECF No. 105 at 14–29.)

As the Court determined in Part III.B, Plaintiffs have failed to put forward

admissible evidence creating a genuine disputed material fact regarding Plaintiffs' injury

or demonstrate that consumers were actually deceived by Defendants' use of Plaintiffs'

marks.  Accordingly, the Court grants summary judgment in favor of Defendants as to

Plaintiffs' claims under the Lanham Act and common law trademark claim.

**E.     Claim Six: Colorado Consumer Protection Act Claim**

The Colorado legislature enacted the Colorado Consumer Protection Act

("CCPA") "to regulate commercial activities and practices which, because of their

nature, may prove injurious, offensive, or dangerous to the public.  The CCPA deters

and punishes businesses which commit deceptive practices in their dealings with the

public by providing prompt, economical, and readily available remedies against

consumer fraud."  *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62

P.3d 142, 146 (Colo. 2003) (en banc) (internal citations and quotation marks omitted).

The elements of a private CCPA cause of action are:

> (1) that the defendant engaged in an unfair or deceptive
> trade practice;

---

[10] To the extent the relevant analysis under the common law trademark infringement and unfair competition claim is different than the relevant analysis under the Lanham Act, the Court finds that Plaintiffs have conceded the point by failing to make any independent argument as to their common law claims.  *See Phillips v. Calhoun*, 956 F.2d 949, 953–54 (10th Cir. 1992) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point.'" (*quoting Pelfresne v. Village of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990))).

(2) that the challenged [unfair or deceptive] practice occurred in the course of defendant's business, vocation, or occupation;

(3) that [the challenged unfair or deceptive practice] significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property;

(4) that the plaintiff suffered injury in fact to a legally protected interest; and

(5) that the challenged practice caused the plaintiff's injury.

*Id.* at 146–47.

Defendants argue, *inter alia*, that "Plaintiffs have not shown that they suffered injury or that HomeAdvisor's ads actually *caused* such injury if there was one." (ECF No. 104 at 25 (emphasis in original).)  In response, Plaintiffs argue that "Defendants caused Plaintiffs' injury by using the TOM MARTINO and REFERRAL LIST marks without notice, license, or permission, and directly profited from the ads that used the marks." (ECF No. 114 at 34.)

However, as the Court explained in Part III.B.1, Plaintiffs have not provided the Court with evidence that Defendants harmed them by diverting consumers and revenue from Plaintiffs.

Accordingly, the Court grants summary judgment in favor of Defendants as to Plaintiffs' CCPA claim.[11]

---

[11] Because the Court grants summary judgment in favor of Defendants based on Plaintiffs' failure to establish a genuine issue of material fact regarding injury, the Court need not address Defendants' arguments regarding other elements of Plaintiffs' CCPA claim.  (ECF No. 104 at 24–25.)

F.      **Claim Seven: Unjust Enrichment**

"Unjust enrichment is a judicially created remedy designed to avoid benefit to one to the unfair detriment of another." *Martinez v. Colo. Dep't of Human Serv.,* 97 P.3d 152, 159 (Colo. App. 2003).  To establish a claim for unjust enrichment, a plaintiff must demonstrate that "(1) at [his or her] expense, (2) the defendant received a benefit (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying."  *Donchez*, 392 F.3d at 1221 (quoting *Martinez*, 97 P.3d at 159).

Defendants argue that "Plaintiffs have no evidence that defendants were enriched *at Plaintiffs' expense*" and have "[f]ailed to show any of evidence of injury, that they lost specific clients due to Defendants' advertisements, or that they lost revenue since Defendant[s] ran the advertisement at issue."  (ECF No. 104 at 26 (emphasis in original).)

Plaintiffs concede that they have not established the precise amount of enrichment or loss, but they argue that they have established that "Defendants diverted traffic to their website, revenue was diverted to HomeAdvisor, and negative publicity was generated."  (ECF No. 114 at 34.)  Plaintiffs further argue that "Defendants gained by not paying any license fees to Plaintiffs for Tom Martino's endorsement and the trademarks, as well as from the dollars generated by the misleading ads."  (*Id.*)

However, as explained above in Part III.B, Plaintiffs have not provided the Court with any admissible evidence demonstrating that Defendants have enriched themselves at Plaintiffs' expense by diverting any revenue from Plaintiffs, causing Plaintiffs to suffer negative publicity from Defendants' advertisements, or depriving Plaintiffs of the terms of a hypothetical endorsement deal.

Accordingly, the Court grants summary judgment in favor of Defendants as to the unjust enrichment claim.

**G:     Claim Eight: Negligence**

To establish a negligence claim under Colorado law, a plaintiff must establish: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty; (3) injury to the plaintiff; and (4) a proximate cause relationship between the breach and the injury. *Bullock v. Wayne*, 623 F. Supp. 2d 1247, 1252 (D. Colo. 2009), *as amended* (Apr. 17, 2009) (citing *Casebolt v. Cowan*, 829 P.2d 352, 356 (Colo. 1992) (en banc)).

Defendants argue that Plaintiffs have failed to present "credible or competent evidence of injury or a proximate cause relationship between the breach of duty and the alleged injury." (ECF No. 104 at 30.) For the reasons set forth in Part III.B, the Court agrees that Plaintiffs have failed to provide admissible evidence of its injury and/or damages.

Accordingly, the Court grants summary judgment in favor of Defendants as to Plaintiffs' negligence claim.[12]

### IV. CONCLUSION

For the reasons set forth above, the Court ORDERS that:

1.      Defendants' Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 and Memorandum in Support (ECF No. 104) is GRANTED;

2.      Plaintiffs' Joint Motion for Partial Summary Judgment (ECF No. 105) is

---

[12] Because the Court grants summary judgment in favor of Defendants based on Plaintiffs' failure to establish a genuine issue of material fact regarding injury, the Court need not address Defendants' arguments that Defendants did not owe Plaintiffs a duty. (ECF No. 104 at 28–29.)

DENIED;

       3.     Defendants' Motion to Exclude the Testimony of Plaintiffs' Damages Expert, Peter J. Schaffer (ECF No. 139) is GRANTED;

       4.     The Clerk shall enter judgment in favor of Defendants HomeAdvisor, Inc. and ANGI Homeservices, Inc. and against Plaintiffs Troubleshooter Network, Inc. and Thomas G. Martino and shall terminate this case; and

       5.     Defendants shall have their costs, if any, upon compliance with D.C.COLO.LCivR 54.1

       Dated this 24th day of November, 2021.

                              BY THE COURT:

                              _____

                              William J. Martinez
                              United States District Judge